AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Delaware

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Two Apple Iphones Currently Located at the FBI Wilmington, Delaware Office

)
)
)
)
)

Case No. 19 - 297 M

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____ District of _____ Delaware _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | *Offense Description* |
|---|---|---|
| 18 USC 1344(2) | Bank Fraud | |
| 18 USC 1343 | Wire Fraud | |
| 18 USC 1956 and 1957 | Money Laundering | |

The application is based on these facts:
See attached application

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Benjamin Lindemann Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/5/2019

City and state: Wilmington, DE

_____
*Judge's signature*

Sherry R. Fallon   U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN THE MATTER OF THE SEARCH
OF **TWO APPLE IPHONES** CURRENTLY
LOCATED AT **THE FBI WILMINGTON,
DELAWARE OFFICE.**

Misc. No. _____

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Benjamin Lindemann, ("Your Affiant") Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, and do hereby depose and state as follows:

### INTRODUCTION AND PERTINENT STATUTES

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property - an Apple iPhone with the writing "(Product) Red" on the back of the device as well as a grey Apple iPhone with the writing "iPhone" on the back of the device (hereinafter "TARGET IPHONES") - and the extraction from that property of electronically stored information as described in Attachment B. On November 13, 2019, the TARGET IPHONES were seized as part of a search incident to the arrest of Aaron Davis (hereinafter "Davis").[1] The TARGET IPHONES were located in the coat pocket Davis was wearing at the time of his arrest. The TARGET IPHONES are currently located at the FBI Wilmington, Delaware Resident Agency, located at 500 Delaware Avenue, Wilmington, DE 19801. As set forth herein, there is probable cause to believe that the contents of the TARGET

---

[1] The arrest warrant for Davis was issued in the District of Delaware on November 12, 2019. The arrest of Davis occurred at the Wawa Gas Station located at 1693 Pulaski Highway, Bear, DE 19701. Subsequent to the arrest of Davis, a search warrant was executed at Davis' residence, 4 Wildfields Court, Bear, DE 19701. The search warrant was issued in the District of Delaware on November 12, 2019 and authorized the seizure of electronic devices from the residence.

IPHONES bear evidence and instrumentalities of violations of Title 18, United States Code, Section 1344(2) (Bank Fraud), Title 18, United States Code, Section 1343 (Wire Fraud); Title 18, United States Code, Sections 1956 and 1957 (Money Laundering) (hereinafter collectively referred to as the "SPECIFIED FEDERAL OFFESNSES").

2.      There exists probable cause that Davis, acting in conjunction with his business All American Auto ("AAA"), used cellular devices to further a scheme in which he received over $1,300,000 in fraudulent payments from a not-for-profit health care company, the Social Security Administration, and victims of romance and identity theft scams. The fraudulent payments resulted in losses of approximately $288,913 to the various entities listed above. Davis withdrew a majority of the funds he could access in the form of cash and certified checks made payable to himself and/or AAA.

3.      According to records obtained through a Grand Jury subpoena, Aaron Davis is the registered subscriber of both telephone numbers 302-561-4463 and 302-419-5573. Toll records show that both telephone numbers were active from at least January 1, 2017 until at least June 24, 2019. Toll records also indicate that Davis used multiple telephonic devices during this same period, and all of the devices were Apple iPhones. It is reasonable to assume that Davis may have transferred data from one device to the next. Based on my training and experience I know that individuals frequently back-up data stored on cellular devices to include contacts, messages, call logs, photos, etc. and then transfer the information when they purchase a new cellular device.

## PROFESSIONAL BACKGROUND

4.      I am a Special Agent of the FBI and have been so employed since March 2017. Prior to joining the FBI, I was employed as a senior accountant, specializing in tax and valuation services at a public accounting firm in the Washington, DC area.  I am an actively licensed

Certified Public Accountant in Virginia and have maintained that license since 2013. I am currently assigned to the FBI's Wilmington Resident Agency of the Baltimore Field Office and work on the white collar and complex financial fraud squad. I have been trained in investigating white-collar crime and have experience in cases related to various types of fraud, to include health care fraud, fraud against the government, and complex financial crime matters. In my experience as a Special Agent with the FBI, I have prepared, assisted, and/or participated in the execution of numerous search and arrest warrants. As a Federal Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. In the course of my duties as an FBI Special Agent, I am authorized to investigate, among other federal crimes, the offenses set forth in paragraph one.

5.     I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the TARGET IPHONES specified below for the items and information described in Attachment B. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). This affidavit of probable cause in support of a Search Warrant is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

6.     In October 2017, the FBI Wilmington Resident Agency received a complaint from Sutter Health, a not-for-profit network of health care centers in California. Sutter Health sent over $1,000,000 in payments intended for Herrero Builders, a construction company, to a bank account

in the name of AAA, as a result of a business email compromise ("BEC") scam. The ACH payment instructions for Herrero Builders were changed as a result of a request to Sutter Health from an unknown telephone caller and emails sent to Sutter Health from a fake Herrero Builders domain name. The fake email directed payments for Herrero Builders to a bank account opened by Davis in the name of AAA. In addition to the BEC funds received from Sutter Health, Davis also fraudulently obtained funds from Social Security Administration ("SSA") as well as money sent by victims of identity theft and romance scams.

### Augustine Jappah

7.      In July 2019, the FBI learned through a confidential source that Augustine Jappah ("Jappah), also known as Lewis Boakai, is likely a person with whom Davis was working to accomplish his fraud scheme. According to the confidential source, Jappah caused fraudulent payments to be sent to bank accounts owned by Aaron Davis.

8.      Analysis of toll records show that Davis used both of his phone numbers to contact Jappah's phone number, 310-756-5217, between 2017 and early 2019. Specifically, between the months of July and September 2017, there were over 150 phone calls or text messages between Jappah and Davis' numbers. This period of July through September 2017 is the same period during which Davis received some of the fraudulent payments previously discussed.

### AAA Background

1.      On August 7, 2013 Batiekro Nabwe ("Nabwe"), Davis's wife and original owner of AAA, applied for and received a wholesaler's license to sell motor vehicles with the Delaware Department of Motor Vehicles ("DMV"). On February 20, 2014, Nabwe transferred ownership of AAA to Davis, but she remained an authorized signature for AAA with the DMV. AAA's wholesaler's license with the DMV expired on December 31, 2016. On February 27, 2017, the

DMV sent Davis a letter denying AAA's request for renewal of its dealer license due to a "material misstatement or omission on the application for a dealer license". Davis and AAA never regained a license from the DMV to wholesale vehicles.

2.      In mid-2017, after AAA lost its wholesalers license, Davis opened several bank accounts in the name of AAA. Davis used these AAA bank accounts to receive fraudulent deposits from multiple schemes. When bank investigators questioned Davis about the legitimacy of the deposits, Davis claimed that the fraudulent deposits were part of the legitimate business of selling automobiles. However, the victims of the fraudulent transfers never purchased or conducted any business with Davis or AAA. AAA's bank accounts used by Davis to collect fraudulent funds included accounts at Sun Trust Bank, TD Bank, Citizen's Bank, and PNC Bank.

### Sun Trust Bank Account 100231069161

3.      On June 21, 2017, Davis opened AAA's Sun Trust Account 100231069161 ("9161"), with an initial $100 opening deposit. The work phone number associated with account 9161 was 302-419-5573. On June 26, 2017, account 9161 received a $21,195 electronic ACH transfer from the SSA intended for an individual, J.A. ("J.A."). On August 9, 2017, Davis received a second ACH transfer for $2,317 from the SSA intended for the same unrelated individual. As of the dates of the SSA deposits, J.A. had not applied for any retirement benefits from the SSA.

4.      On July 17, 2017, a check for $15,850, from an individual named R.S. ("R.S"), was deposited into account 9161. On July 21, 2017, a second check, from D.S. ("D.S") for $73,500, was deposited into account 9161. Both of these checks were returned unpaid, prior to any withdrawal of funds against those deposits.

5.      On July 20, 2018, Davis contacted SunTrust bank via telephone and told a customer service representative that he was expecting a wire for $15,850. On July 24, 2017, Davis again confirmed to SunTrust representatives that he was expecting transactions. The bank representative informed Davis that his account was closed because he broke bank rules and regulations

6.      An FBI Agent and an FBI Task Force Officer ("TFO") interviewed both D.S. and R.S. Neither D.S. nor R.S. knew or ever dealt with Davis or AAA. A summary of the interviews with D.S. and R.S. is contained below in paragraphs 22 and 23.

7.      The only legitimate funds deposited into account 9161 was the initial $100 opening deposit. All of the other deposits into the account were fraudulent.  Below is a summary of how the fraudulent funds deposited by the SSA were spent by Davis.

| SunTrust 100231069161 | | |
|---|---|---|
| **Withdrawal Category** | | **Amount** |
| Checks written for Davis | $ | 11,920 |
| Wal-Mart | | 4,557 |
| Shoprite | | 2,526 |
| Closing Debit | | 2,317 |
| ATM Cash Withdrawal | | 1,709 |
| Miscellaneous Other | | 817 |
| | $ | 23,846 |

8.      On July 17, 2018, Davis called a SunTrust bank representative to set up a User ID and password for online banking. Davis provided his email address to the representative as "allamericanauto4463@gmail.com." During the call, the bank representative sent Davis a link to set up online banking. On July 18, 2018, Davis called a SunTrust bank representative again. Davis stated that he had attempted to access AAA's bank account via a mobile phone application. The bank representative told Davis that in order to activate mobile phone banking he must first log-in through a desktop computer.

## TD Bank Account 4282898225

9.     On March 4, 2014, Davis and Nabwe, opened TD Account 4282898225 **("**8225"). Between July 13, 2017 and July 19, 2017 four fraudulent checks were deposited into TD account 8225. Two of the checks, one for $4,999 and one for $19,880, were written from an account in the name of R.S. The other two checks, one for $38,750 and one for $28,500, were written from an account in the name of D.S. TD Bank suffered a loss of approximately $40,000 from these bad checks.

10.     A TD Bank investigator informed Davis that his account was flagged for fraudulent activity. In turn, on October 15, 2017, Davis filed a police report with New Castle County Police Department ("NCCPD") to report "fraudulent checks" deposited into his account. Davis reported that he received the check from D.S. for $38,750 and the check for $4,999 from R.S. for vehicle payments. Davis initially sent supporting business records to the officer via email.

11.     Below is a summary of the withdrawals made from TD Account 8225 from the date the first bad check was deposited on July 13, 2017, until the account was closed around July 27, 2017, by TD Bank.[2] Davis confirmed to TD Bank investigators that all withdrawals made from TD Account 8225 were made by him.

| TD Account 4282898225 for the period 7/13/2017 -7/27/2017 | | |
|---|---|---|
| **Withdrawal Category** | | **Amount** |
| ATM/ CASH WITHDRAWAL | $ | 15,018 |
| CASINO | | 10,229 |
| CASH - CERTIFIED CHECK | | 8,400 |
| MISC. EXPENSES | | 3,021 |
| MANHEIM AUTO AUCTION | | 2,660 |
| FOOD/ GROCERY/ RESTAURANT | | 1,669 |
| | $ | 40,997 |

## Citizens Bank Account 8203253928

---

[2] In their investigative file, TD Bank noted that Davis was a "victim" of bank fraud based on Davis' filing a police report.

12.    On August 3, 2017, Davis opened Citizens Bank Account 8203253928 ("3928") in the name of AAA. Davis again funded the account with an initial $100 cash deposit. Between September 6, 2017, and September 20, 2017, Davis received multiple ACH payments totaling $1,152,543 from Sutter Health due to the BEC. Davis made multiple large withdrawals almost immediately after the money was deposited into his account. The total unrecovered funds as a result of the BEC was approximately $217,070. Sutter Health confirmed they did not intend to send any payments to Davis and AAA. Sutter Health also confirmed that they never purchased ambulances from either AAA or Aaron Davis.

13.    On September 7, 2018, a Citizens Bank representative informed Davis that he was potentially receiving fraudulent funds from Sutter Health. Davis stated that the funds deposited into his account were to buy ambulances at auctions and send the ambulances to Africa in conjunction with his online business partner. The Citizens Bank representative advised Davis to retain all documents related to the use of the funds. On September 15, 2018, a Citizens Bank representative contacted Davis again about the fraudulent activity on the account. Davis stated that he continued to withdraw the funds because his online business partner informed him that the funds were not fraudulent.

14.    Davis contacted Citizens Bank using telephone numbers 302-561-4463 and 302-419-5573.

15.    Below is a summary of the funds withdrawn from Citizens Account 3928 before Citizens Bank froze the account.

| Citizens Account 8203253928 | | |
|---|---|---|
| **Withdrawal Category** | | **Amount** |
| Certified Check - ALL AMERICAN AUTO | $ | 85,600 |
| Certified Check - MANHEIM AUTO | | 54,076 |
| CASH WITHDRAWAL | | 19,990 |
| MISC. RETAIL PURCHASES | | 4,919 |
| | $ | 164,585 |

16. Some of the Certified Checks made out to Manheim Auto Auction were used to purchase vehicles for the business Abby & Gabby Auto LLC. Manheim Auto Auction records list Aaron Davis as the representative contact for Abby & Gabby Auto LLC.

17. When Citizens Bank froze account 3928, approximately $55,000 remained. On April 22, 2018, Davis visited Citizens Bank at 146 Fox Hunt Drive, Bear DE ("Fox Hunt Drive"), and attempted to gain access to the remaining funds, but the bank did not release the funds.

18. On June 26, 2018, Davis called a Citizens Bank representative regarding the remaining funds in account 3928. The representative explained to Davis that Sutter Health claimed fraud due to a BEC and did not intend to send the funds to Davis. Davis stated that he had made deposits of $14,000 into the account prior to receiving Sutter Health's funds and threatened to call the police in order to access to those funds. Citizens Bank records indicate that apart from the $1,152,543 in funds received from Sutter Health, account 3928 received approximately seven small deposits totaling $3,028.

## PNC Bank Account 5696026649

19. On July 20, 2017, Davis opened PNC bank account 5696026649 ("6649) in the name of AAA, with an initial $800 deposit. Davis deposited five Citizens Bank certified checks totaling $85,600 into PNC account 6649 between September 7, 2017 and October 2, 2017. The certified checks were the same certified checks purchased by Davis with the funds received from Sutter Health as a part of the BEC scam. These certified checks accounted for approximately 70%

of the deposits made into account 6649. After the checks were deposited into account 6649, Davis made 70 ATM and cash withdrawals totaling $75,689 between September 8, 2017, and December 7, 2017.

## Vehicle Sales

20.    On June 26, 2018, New Castle County Police Department ("NCCPD") took a complaint related to vehicles sold by Davis. The complaint stated that the home owner was running a car sales business from his residence and parked vehicles in his driveway and on the street with no license plate. The homeowner advertised online using AAA. During a property check, NCCPD officers noted two vehicles with expired temporary tags.

21.    On September 18, 2018, surveillance at Davis' residence noted a tall dark skinned black male parking a Black GMC Yukon. The black male appeared to resemble Davis. The temporary tag on the Yukon was purchased by DWS Investments LLC doing business as ACW. On September 18, 2018, your affiant saw an advertisement on the Delaware Craigslist website for a Black 2013 GMC Yukon XL listing 302-561-4463 as the contact number. The pictures in the advertisement showed the Black GMC Yukon parked in the driveway of Davis' residence

## D.S. Interview

22.    D.S. was interviewed at D.S.'s home in Illinois by an FBI Agent. D.S. first met her boyfriend, "Bill Adebayor," through Facebook and would talk with him over the telephone. Adeboyar told D.S. he was from California but was living in Africa. D.S. never met Adeboyar in person during the one year they had been dating. Based on Adebayor's instructions, D.S. wrote checks on her bank account even though she knew there were not funds available. Adebayor would provide D.S. a name, amount and an address for where to send the checks. D.S. did not recognize the names Aaron Davis or AAA.

### R.S. Interview

23.   R.S. was interviewed by an FBI Task Force Officer in Indiana. According to R.S., someone used R.S.'s information to send bad checks to different locations. R.S notified his bank and closed his account from which the bad checks were drawn. R.S. does not know Davis or AAA and indicated that he purchased all of his vehicles locally.

## **TECHNICAL TERMS**

24.   Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.   "Digital device," as used herein, includes the following three terms and their respective definitions:

1)   A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)   "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)    "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.    "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities.  These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.　　A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d.　　A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.　　"Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit

boards.  Data security software of digital code may include programming code that creates "test"

keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security

software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it

inaccessible or unusable, as well as reverse the progress to restore it.

        f.     "Computer software" means digital information which can be interpreted

by a computer and any of its related components to direct the way they work.  Computer software

is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run

operating systems, applications, and utilities.

        g.     Internet Protocol ("IP") Address is a unique numeric address used by digital

devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers,

each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the

Internet must be assigned an IP address so that Internet traffic sent from and directed to that

computer may be directed properly from its source to its destination.  Most Internet service

providers control a range of IP addresses.  Some computers have static—that is, long-term—IP

addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

        h.     The Internet is a global network of computers and other electronic devices

that communicate with each other using numerous specified protocols.  Due to the structure of the

Internet, connections between devices on the Internet often cross state and international borders,

even when the devices communicating with each other are in the same state.

        i.     "Domain Name" means the common, easy-to-remember names associated

with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of

149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level

delimited by a period.  Each level, read backwards – from right to left – further identifies parts of

an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

j.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

k.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

25.      Based on my training and experience I know that the TARGET IPHONES have capabilities that allow them to serve in a multitude of ways to include as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things,

evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offenses under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC

## ANALYSIS

26.     As described above and in Attachment B, this application seeks permission to search for information that might be found within the Devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Devices for at least the following reasons:

a.     Individuals who engage in criminal activity, including THE SPECIFIFIED FEDERAL OFFENSES may use digital devices to communicate with co-conspirators online; to store on digital devices documents and records relating to their illegal activity, which can include logs of online "chats" with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

   b. Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

   c. Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

27.     As further described in Attachment B, this application seeks permission to locate

not only electronic evidence or information that might serve as direct evidence of the crimes

described in this affidavit, but also for forensic electronic evidence or information that

establishes how the digital device(s) were used, the purpose of their use, who used them (or did

not), and when.  Based on my knowledge, training, and experience, as well as information

related to me by agents and others involved in this investigation and in the forensic examination

of digital devices, I respectfully submit there is probable cause to believe that this forensic

electronic evidence and information will be in any of the Device(s) at issue here because:

a.     Although some of the records called for by this warrant might be found in the

form of user-generated documents or records (such as word processing, picture, movie, or texting

files), digital devices can contain other forms of electronic evidence as well.  In particular,

records of how a digital device has been used, what it has been used for, who has used it, and

who has been responsible for creating or maintaining records, documents, programs,

applications, and materials contained on the digital device(s) are, as described further in the

attachments, called for by this warrant.  Those records will not always be found in digital data

that is neatly segregable from the hard drive, flash drive, memory card, or other electronic

storage media image as a whole.  Digital data stored in the Device(s), not currently associated

with any file, can provide evidence of a file that was once on the storage medium but has since

been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted

from a word processing file).  Virtual memory paging systems can leave digital data on a hard

drive that show what tasks and processes on a digital device were recently used.  Web browsers,

e-mail programs, and chat programs often store configuration data on a hard drive, flash drive,

memory card, or memory chip that can reveal information such as online nicknames and

passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

       b.    Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

       c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

       d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how

the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.     I know that when an individual uses a digital device to commit the SPECIFIED FEDERAL OFFENSES, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## **METHODS TO BE USED TO SEARCH DIGITAL DEVICES**

28.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part

because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or

software requires specialized tools and a controlled laboratory environment, and can require substantial time.

   d.  Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through

data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

      e.    Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

      f.    Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches,

and misdirected time and effort, as forensic examiners encounter technological and user-created

challenges, content, and software applications that cannot be anticipated in advance of the

forensic examination of the devices.  In light of these difficulties, your affiant requests

permission to use whatever data analysis techniques reasonably appear to be necessary to locate

and retrieve digital information, records, or evidence within the scope of this warrant.

        g.    In searching for information, records, or evidence, further described in

Attachment B, law enforcement personnel executing this search warrant will employ the

following procedures:

        1.    The digital devices, and/or any digital images thereof created by

law enforcement in aid of the examination and review, will be examined and reviewed by law

enforcement personnel, sometimes with the aid of a technical expert, in an appropriate setting, in

order to extract and seize the information, records, or evidence described in Attachment B.

        2.    The analysis of the contents of the digital devices may entail any or

all of various forensic techniques as circumstances warrant.  Such techniques may include, but

shall not be limited to, surveying various file "directories" and the individual files they contain

(analogous to looking at the outside of a file cabinet for the markings it contains and opening a

drawer believed to contain pertinent files); conducting a file-by-file review by "opening,"

reviewing, or reading the images or first few "pages" of such files in order to determine their

precise contents; "scanning" storage areas to discover and possibly recover recently deleted data;

scanning storage areas for deliberately hidden files; and performing electronic "keyword"

searches through all electronic storage areas to determine whether occurrences of language

contained in such storage areas exist that are related to the subject matter of the investigation.

3.      In searching the digital devices, the forensic examiners may

examine as much of the contents of the devices as deemed necessary to make a determination as

to whether the contents fall within the items to be seized as set forth in Attachment B.  In

addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or

encrypted data to determine whether the contents fall within the items to be seized as described

in Attachment B.  Any search techniques or protocols used in searching the contents of the

digital devices will be specifically chosen to identify the specific items to be seized under this

warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

29.      Because forensic examiners will be conducting their search of the digital devices

in a law enforcement setting over a potentially prolonged period of time, I respectfully submit

good cause has been shown, and therefore request authority, to conduct the search at any time of

the day or night.

### Conclusion

28.      As set forth above, there is probable cause to believe that evidence of the crimes,

may be found in the TARGET IPHONES. The evidence reflects that Davis used his cellphones

to conduct and attempt to conceal bank fraud, wire fraud and money laundering schemes. Davis

telephonically contacted the representatives at the banks in an effort to access the fraudulently

obtained funds. Subpoena records show that Davis had two telephones registered to him

throughout the period during which the fraud schemes took place. Subpoena records also show

both numbers remain active until as recently as June 2019.

29.      I submit that this affidavit supports probable cause for warrants to search the

contents of the TARGET IPHONES, as specified in Attachment B.

Respectfully submitted,

Special Agent Benjamin Lindemann
Federal Bureau of Investigation

Sworn and subscribed before me

this 5th day of December, 2019

The Honorable Sherry Fallon
United State Magistrate Judge

## <u>ATTACHMENT A</u>

## I.    Item to be Searched – TARGET IPHONE

The items to be searched (the "**TARGET IPHONES**) are identified as an Apple iPhone with the writing "(Product) Red" on the back of the device as well as a grey Apple iPhone with the writing "iPhone" on the back of the device. (Photos of the TARGET IPHONES are contained below. The items are currently being stored at the FBI Wilmington, Delaware Resident Agency located at 500 Delaware Avenue, Suite 300, Wilmington, DE 19801.





## **ATTACHMENT B**

1.      All records on the TARGET IPHONES described in Attachment A that relate to

violations of Title 18, United States Code, Section 1344(2) (Bank Fraud), Title 18, United States

Code, Section 1343 (Wire Fraud); Title 18, United States Code, Sections 1956 and 1957 (Money

Laundering), in whatever form they exist, including electronic storage, including but not limited

to:

- a.  Any electronic calendars, notes, task lists, or other information relating to any person's whereabouts or activities relevant to violations of the "SPECIFIED FEDERAL OFFENSES";

- b.  Images, pictures, photographs, videos, or other visual depictions sent or received by the TARGET IPHONES regardless of the underlying program used to create, store, send, or receive such depictions relating to violations of the "SPECIFIED FEDERAL OFFENSES";

- c.  GPS data showing the location and movement of the TARGET IPHONES from January 1, 2018, to present;

- d.  Bank records, checks, credit card bills, account information, and other financial records related to violations of the "SPECIFIED FEDERAL OFFENSES"; and

- e.  The content of any and all text messages or instant messages sent or received by the TARGET IPHONES regardless of the underlying program used to send and receive those messages relating to violations of the "SPECIFIED FEDERAL OFFENSES."

2.      Evidence of user attribution showing who used or owned the TARGET IPHONES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.